Richard S. Busch (SBN 319881)
*E-Mail: rbusch@kingballow.com*
KING & BALLOW
1999 Avenue of the Stars, Suite 1100
Century City, CA 90067
Telephone: (424) 253-1255
Facsimile: (888) 688-0482

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| William Ryan Key, Peter Michael Mosely, Longineu Warren Parsons, and Sean Michael Wellman-Mackin<br><br>PLAINTIFFS,<br><br>vs.<br><br>Jarad A. Higgins p/k/a Juice WRLD, Danny Lee Snodgrass Jr. p/k/a Taz Taylor, Nicholas Mira, BMG Rights Management (US) LLC d/b/a BMG Platinum Songs (US), Taz Taylor Beats, LLC, Artist 101 Publishing Group, Nick Mira Publishing, Electric Feel Music, Kobalt Music Services America, Inc., Songs of Universal, Inc., Grade A Productions, LLC, and Interscope Records.<br><br>DEFENDANTS. | Case No.: _____<br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint Filed: |

## JURISDICTION

1.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as the action arises under the original and exclusive jurisdiction of the federal

court and 28 U.S.C. § 1338(a) and the Copyright Act of 1976 (17 U.S.C § 101 *et seq*.).

2.     This Court has personal jurisdiction over Defendants as discussed fully herein.

3.     Jarad A. Higgins p/k/a Juice WRLD ("Juice WRLD") is a co-writer and the performer of "Lucid Dreams" (the "Infringing Work" or "Lucid Dreams") and the infringing sound recording embodying the Infringing Work (the "Infringing Sound Recording," or collectively with the Infringing Work, "Lucid Dreams"). This Court has general personal jurisdiction over Juice WRLD because, upon information and belief, he is a resident of the State of California and this Judicial District specifically.

4.     This Court has specific personal jurisdiction over Juice WRLD because this suit arises out of or relates to his contacts with the State of California and this Judicial District. On information and belief, Juice WRLD has licensed and/or authorized the licensing, distribution, and sale of the Infringing Work, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording, for digital download, and for streaming, among other things.  Juice WRLD has further, upon information and belief, directly advertised or authorized others to advertise the Infringing Work and Infringing Sound Recording through California companies and to California residents, and has generated substantial revenues from selling the Infringing Work and Infringing Sound Recording in the State of California and this Judicial District. Juice WRLD has also performed the Infringing Work and Infringing Sound Recording in California locations including the following:  (1) performing the Infringing Work at Earl Warren Showgrounds on October 14, 2018 in Santa Barbara, California; (2) performing the Infringing Work at Banc of California

Stadium on December 14, 2018 in Los Angeles, California; (3) performing the Infringing Work at Bill Graham Civic Auditorium on April 30, 2019 in San Francisco, California; (4) performing the Infringing Work at Greek Theater on May 2, 2019 in Los Angeles, California; and (5) performing the Infringing Work at Auto Club Speedway on August 3, 2019 in Fontana, California.  Juice WRLD has also signed a writer affiliation agreement with the performing rights organization BMI, which has an office in this Judicial District, and licenses the Infringing Work to venues in California on behalf of Juice WRLD.

5.     Danny Lee Snodgrass, Jr. p/k/a Taz Taylor ("Taz Taylor") and Nicholas Mira ("Nick Mira") are founders of the production collective called Internet Money Records ("Internet Money").  In April 2018, Internet Money secured a joint venture with Alamo Records and Interscope Records.  In May 2018, Internet Money purchased a Hollywood Hills mansion.  Upon information and belief, Defendant Taz Taylor and Defendant Nick Mira reside in the Hollywood Hills mansion and are thus residents of the State of California.

6.     Defendant Taz Taylor is a credited writer of the Infringing Work. This Court has general personal jurisdiction over Taz Taylor because, upon information and belief, he is, as discussed above, a resident of the State of California and this Judicial District specifically.

7.     This Court has specific personal jurisdiction over Taz Taylor because his suit-related conduct creates a substantial connection with the State of California.   Taz Taylor knowingly and intentionally licensed and distributed the Infringing Work, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording, for digital download, and for streaming, among other things. Taz Taylor's conduct caused injury to, and is directed at, Plaintiffs and their intellectual property within the United States and

the State of California. Taz Taylor has benefitted substantially from the sale and exploitation of the Infringing Work to California residents; actively participated in and/or authorized the unlawful manufacture of the Infringing Work in California and to California companies; and advertised the Infringing Work to California residents and through California companies.  Taz Taylor has also signed a writer affiliation agreement with the performing rights organization BMI, which has an office in this Judicial District, and licenses the Infringing Work to venues in California on behalf of Mr. Taylor.

8. Defendant Nick Mira is a credited writer of the Infringing Work and the producer of the Infringing Sound Recording.  This Court has general personal jurisdiction over Nick Mira because, as discussed above, upon information and belief, he is a resident of the State of California and this Judicial District specifically.

9. This Court has specific personal jurisdiction over Nick Mira because his suit-related conduct creates a substantial connection with the State of California.  Nick Mira also knowingly and intentionally licensed and distributed the Infringing Work, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording, for digital download, and for streaming, among other things. Nick Mira's conduct caused injury to, and is directed at, Plaintiffs and their intellectual property within the United States and the State of California. Nick Mira has benefitted substantially from the sale and exploitation of the Infringing Work to California residents, and is, at a minimum, constructively aware of his continuous and substantial commercial interactions with California residents.  Nick Mira also actively participated in and/or authorized the unlawful manufacture of the Infringing Work in California and to California companies, and advertised the Infringing Work to California residents

and through California companies. Finally, Nick Mira has also signed a writer affiliation agreement with the performing rights organization BMI, which has an office in this Judicial District, and licenses the Infringing Work to venues in California on behalf of Mira.

10.     Upon information and belief, BMG Rights Management (US) LLC d/b/a BMG Platinum Songs (US) ("BMG") is a publisher of Defendant Juice WRLD's interest in the Infringing Work and Infringing Sound Recording.  BMG is a Delaware limited liability company registered to do business in the State of California.  This Court has general personal jurisdiction over BMG because, upon information and belief, it has continuous and systematic contacts with the State of California to render it essentially at home in California. Specifically, BMG maintains a strong presence in California, including an office located at 6100 Wilshire Boulevard, Suite #1600, Los Angeles, California 90048, where it employs California residents. Defendant BMG is a publisher for Defendant Juice WRLD and upon information and belief, collects Juice WRLD's share of the Infringing Work.

11.     This Court has specific personal jurisdiction over BMG because its suit-related conduct creates a substantial connection with the State of California, which includes:  (1) BMG is engaged in conduct within the State of California and in this Judicial District, specifically BMG knowingly and intentionally licensed and distributed the Infringing Work, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording, for digital download, and for streaming, among other things; (2) BMG's conduct causes injury to, and is directed at, Plaintiffs and their intellectual property within the United States and the State of California; (3) BMG has benefitted substantially from the sale and exploitation of the Infringing Work to California

residents; (4) BMG is, at a minimum, constructively aware of its continuous and substantial commercial interactions with California residents; (5) BMG actively participated in and/or authorized the unlawful manufacture of the Infringing Work in California and to California companies; and (6) BMG advertised the Infringing Work to California residents and through California companies.

12.     Upon information and belief, Taz Taylor Beats, LLC ("Taylor Beats") is a publisher of Defendant Taz Taylor's interest in the Infringing Work and Infringing Sound Recording.  This Court has specific personal jurisdiction over Taylor Beats because its suit-related conduct creates a substantial connection with the State of California, which includes:  (1) Taylor Beats is engaged in conduct within the State of California and in this Judicial District, specifically Taylor Beats knowingly and intentionally licensed and distributed the Infringing Work, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording, for digital download, and for streaming, among other things; (2) Taylor Beats's conduct causes injury to, and is directed at, Plaintiffs and their intellectual property within the United States and the State of California; (3) Taylor Beats has benefitted substantially from the sale and exploitation of the Infringing Work to California residents; (4) Taylor Beats is, at a minimum, constructively aware of its continuous and substantial commercial interactions with California residents; (5) Taylor Beats actively participated in and/or authorized the unlawful manufacture of the Infringing Work in California and to California companies; (6) Taylor Beats advertised the Infringing Work to California residents and through California companies; and (7) Taylor Beats, through its affiliation with Kobalt Music Services America, Inc. ("Kobalt"), conducts business in the State of California and this Judicial District and has generated substantial revenue from the

exploitation of the Infringing Work in California from Kobalt's principal place of business located at 8201 Beverly Blvd, 4th Floor, Suite 400, West Hollywood, California 90048.  Defendant Taylor Beats is a publisher for Taz Taylor and upon and information belief, collects the publishing share for Taz Taylor on the Infringing Work.

13.     Upon information and belief, Artist 101 Publishing Group ("Artist 101") is also a publisher of Defendant Taz Taylor's interest in the Infringing Work and Infringing Sound Recording.   This Court has general personal jurisdiction over Artist 101.  Artist 101 is a publisher of Artist Publishing Group, which is the publishing division of Artist Partner Group.  Artist Partner Group is a Delaware corporation existing and organized under the laws of Delaware with a principal place of business at 816 N. Fairfax Avenue, 2nd Floor, Los Angeles California 90046.  Defendant Artist 101 is a publisher for Taz Taylor and upon information and belief, collects a portion of the publishing share for Taz Taylor on the Infringing Work.

14.     This Court has specific personal jurisdiction over Artist 101 because its suit-related conduct creates a substantial connection with the State of California, which includes:  (1) Artist 101 is engaged in conduct within the State of California and in this Judicial District, specifically Artist 101 knowingly and intentionally licensed and distributed the Infringing Work, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording, for digital download, and for streaming, among other things; (2) Artist 101's conduct causes injury to, and is directed at, Plaintiffs and their intellectual property within the United States and the State of California; (3) Artist 101 has benefitted substantially from the sale and exploitation of the Infringing Work to California residents; (4) Artist 101 is, at a minimum, constructively aware of its

continuous and substantial commercial interactions with California residents; (5) Artist 101 actively participated in and/or authorized the unlawful manufacture of the Infringing Work in California and to California companies; (6) Artist 101 advertised the Infringing Work to California residents and through California companies; and (7) Artist 101, through its affiliation with Kobalt, conducts business in the State of California and this Judicial District and has generated substantial revenue from the exploitation of the Infringing Work in California from Kobalt's principal place of business located at 8201 Beverly Blvd, 4th Floor, Suite 400, West Hollywood, California 90048.

15.    Upon information and belief, Nick Mira Publishing ("Nick Mira Publishing") is a publisher of Defendant Nick Mira's interest in the Infringing Work and Infringing Sound Recording. The Court has specific personal jurisdiction over Nick Mira Publishing because its suit-related conduct creates a substantial connection with the State of California, which includes:  (1) Nick Mira Publishing is engaged in conduct within the State of California and in this Judicial District, specifically Nick Mira Publishing knowingly and intentionally licensed and distributed the Infringing Work, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording, for digital download, and for streaming, among other things; (2) Nick Mira Publishing's conduct causes injury to, and is directed at, Plaintiffs and their intellectual property within the United States and the State of California; (3) Nick Mira Publishing has benefitted substantially from the sale and exploitation of the Infringing Work to California residents; (4) Nick Mira Publishing is, at a minimum, constructively aware of its continuous and substantial commercial interactions with California residents; (5) Nick Mira Publishing actively participated in and/or authorized the unlawful manufacture of the Infringing

Work in California and to California companies; (6) Nick Mira Publishing advertised the Infringing Work to California residents and through California companies; and (7) Nick Mira Publishing, through is affiliation with Songs of Universal Inc. ("Songs of Universal"), conducts business in the State of California and this Judicial District and has generated substantial revenue from the exploitation of the Infringing Work in California from Songs of Universal's principal place of business located at 2100 Colorado Avenue, Santa Monica, California 90404. Defendant Nick Mira Publishing is a publisher for Nick Mira and upon information and belief, collects the publishing share for Nick Mira on the Infringing Work.

16.     Upon information and belief, Electric Feel Music ("Electric Feel") is also a publisher of Defendant Nick Mira's interest in the Infringing Work and Infringing Sound Recording.  The Court has specific personal jurisdiction over Electric Feel because its suit-related conduct creates a substantial connection with the State of California, which includes:  (1) Electric Feel is engaged in conduct within the State of California and in this Judicial District, specifically Electric Feel knowingly and intentionally licensed and distributed the Infringing Work, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording, digital download, and streaming, among other things; (2) Electric Feel's conduct causes injury to, and is directed at, Plaintiffs and their intellectual property within the United States and the State of California; (3) Electric Feel has benefitted substantially from the sale and exploitation of the Infringing Work to California residents; (4) Electric Feel is, at a minimum, constructively aware of its continuous and substantial commercial interactions with California residents; (5) Electric Feel actively participated in and/or authorized the unlawful manufacture of the Infringing Work in California and to

California companies; (6) Electric Feel advertised the Infringing Work to California residents and through California companies; and (7) Electric Feel, through is affiliation with Songs of Universal, conducts business in the State of California and this Judicial District and has generated substantial revenue from the exploitation of the Infringing Work in California from Songs of Universal's principal place of business located at 2100 Colorado Avenue, Santa Monica, California 90404. Defendant Electric Feel is a publisher for Nick Mira and upon information and belief, collects the publishing share for Nick Mira on the Infringing Work.

17. Upon information and belief, Defendant Kobalt is the administrator for Defendant Artist 101's and Defendant Taylor Beats's interests in the Infringing Work. This Court has general personal jurisdiction over Kobalt because, upon information and belief, it has continuous and systematic contacts with the State of California to render it essentially at home in California. Specifically, (1) Kobalt is qualified to do business in California and is registered as a foreign corporation with the California Secretary of State; and (2) Kobalt maintains a strong presence in California, including an office located at 8201 Beverly Blvd, 4th Floor, West Hollywood, California 90048, where it employs California residents.

18. This court has specific personal jurisdiction over Kobalt because its suit-related conduct creates a substantial connection with the state of California and this Judicial District. Specifically, (1) Kobalt knowingly and intentionally licensed and distributed, or authorized the licensing and distribution of, the Infringing Work in California and to California companies; (2) Kobalt maintains a contractual relationship with Juice WRLD, a California citizen, under which Kobalt receives income and its interest in the Infringing Work; (3) Kobalt's conduct causes injury to, and is directed at, Plaintiffs and their intellectual

property within the United States and the State of California; (4) Kobalt has benefitted substantially from the sale and exploitation of the Infringing Work to California residents; (5) Kobalt is, at a minimum, constructively aware of its continuous and substantial commercial interactions with California residents; (6) Kobalt actively participated in and/or authorized the unlawful manufacture of the Infringing Work in California and to California companies, including by signing a mechanical license authorizing the inclusion of the Infringing Work in the Infringing Sound Recording; and (7) Kobalt advertised the Infringing Work to California residents and through California companies.

19.     Upon information and belief, Songs of Universal is the administrator for Defendant Electric Feel's and Defendant Nick Mira Publishing's interests in the Infringing Work.  This Court has general personal jurisdiction over Songs of Universal because it is a California corporation organized and existing under the laws of California with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404. Songs of Universal's affiliations are so continuous and systematic as to render it essentially at home in the State of California and this Judicial District. Songs of Universal has generated substantial revenue from the exploitation of the Infringing Work in California from Songs of Universal's principal place of business located in the State of California.

20.     The Court has specific personal jurisdiction over Songs of Universal because its suit-related conduct creates a substantial connection with the State of California, which includes:  (1) Songs of Universal is engaged in conduct within the State of California and in this Judicial District, specifically Songs of Universal knowingly and intentionally licensed and distributed the Infringing Work, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording, for digital download, and for streaming,

among other things; (2) Songs of Universal's conduct causes injury to, and is directed at, Plaintiffs and their intellectual property within the United States and the State of California; (3) Songs of Universal has benefitted substantially from the sale and exploitation of the Infringing Work to California residents; (4) Songs of Universal is, at a minimum, constructively aware of its continuous and substantial commercial interactions with California residents; (5) Songs of Universal actively participated in and/or authorized the unlawful manufacture of the Infringing Work in California and to California companies; and (6) Songs of Universal advertised the Infringing Work to California residents and through California companies.

21.    Grade A Productions, LLC ("Grade A Productions") is the record label of the Infringing Work and Infringing Sound Recording.  This Court has specific personal jurisdiction over Grade A Productions because its suit-related conduct creates a substantial connection with the State of California, which includes:  (1) Grade A Productions is engaged in conduct within the State of California and in this Judicial District, specifically Grade A Productions knowingly and intentionally licensed and distributed the Infringing Work and Infringing Sound Recording, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording,  and licensing the Infringing Sound Recording for digital download and streaming, among other things; (2) Grade A Productions's conduct causes injury to, and is directed at, Plaintiffs and their intellectual property within the United States and the State of California; (3) Grade A Productions has benefitted substantially from the sale and exploitation of the Infringing Work and Infringing Sound Recording to California residents; (4) Grade A Productions is, at a minimum, constructively aware of its continuous and substantial commercial interactions with California residents; (5)

Grade A Productions actively participated in and/or authorized the unlawful manufacture of the Infringing Work and Infringing Sound Recording in California and to California companies; (6) Grade A Productions advertised the Infringing Work and Infringing Sound Recording to California residents and through California companies; and (7) Grade A Productions, through its affiliation with Interscope Records ("Interscope"), conducts business in the State of California and this Judicial District and has generated substantial revenue from the exploitation of the Infringing Work and Infringing Sound Recording in California.

22.    Interscope is a distributor of the Infringing Work and Infringing Sound Recording for Defendant Grade A Productions.  This Court has general personal jurisdiction over Interscope because Interscope's principal place of business is located at 2200 Colorado Avenue, Santa Monica, California 90404. Interscope conducts systematic and continuous business in the State of California and this Judicial District. Upon information and belief, Interscope has generated substantial revenue from the exploitation of the Infringing Work and Infringing Sound Recording in California.

23.    This Court has specific personal jurisdiction over Interscope because its suit-related conduct creates a substantial connection with the State of California, which includes:  (1) Interscope is engaged in conduct within the State of California and in this Judicial District, specifically Interscope knowingly and intentionally licensed and distributed the Infringing Work and Infringing Sound Recording, or authorized the licensing and distribution, to California companies and for California distribution, including licensing the Infringing Work for inclusion in the Infringing Sound Recording, and licensing the Infringing Sound Recording for digital download and streaming, among other things; (2) Interscope's conduct causes injury to, and is directed at, Plaintiffs and their

intellectual property within the United States and the State of California; (3) Interscope has benefitted substantially from the sale and exploitation of the Infringing Work and Infringing Sound Recording to California residents; (4) Interscope is, at a minimum, constructively aware of its continuous and substantial commercial interactions with California residents; (5) Interscope actively participated in and/or authorized the unlawful manufacture of the Infringing Work and Infringing Sound Recording in California and to California companies; and (6) Interscope advertised the Infringing Work and Infringing Sound Recording to California residents and through California companies.

## VENUE

24.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claim occurred in this Judicial District.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1400 as at least one of the Defendants reside or may be found in this Judicial District and is subject to personal jurisdiction.

25.     This case is properly filed in the Central District, as a substantial part of events giving rise to this case occurred in the Central District of California.

## INTRODUCTION

26.     Plaintiffs William Ryan Key ("Key"), Peter Michael Mosely ("Mosely"), Longineu Warren Parsons ("Parsons"), and Sean Michael Wellman-Mackin ("Mackin") p/k/a "Yellowcard" (collectively, "Plaintiffs") hereby complain and allege against Defendants: Juice WRLD, BMG, Artist 101, Nick Mira, Nick Mira Publishing, Electric Feel, Songs of Universal, Taz Taylor, Taylor Beats, Grade A Productions, Kobalt, and Interscope (collectively, "Defendants") as follows:

27.     This is an action for willful copyright infringement. In 2005, Plaintiffs wrote and recorded "Holly Wood Died" (the "Original Work" or "Holly Wood Died"). The Original Work was released on January 24, 2006.  A United States Copyright for the Original Work was duly registered with the United States Copyright Office on March 17, 2006 bearing Registration Number PA0001163895.

28.     The Defendants are the credited writers, performers, publishers, producers, administrators, record labels, and distributors of the Infringing Work and Infringing Sound Recording which, as set forth more fully herein, deliberately copied the infringed original elements from the Original Work. Defendants copied the Original Work without license or consent, and have exploited the subsequent  Infringing Work and Infringing Sound Recording to their collective benefit without regard to Plaintiffs' rights and to Plaintiffs' detriment.  The Infringing Work and Infringing Sound Recording directly misappropriates quantitatively and  qualitatively important portions of Plaintiffs' Original Work in a manner that is  easily recognizable to the ordinary observer. The Infringing Work and Infringing Sound Recording are not only substantially similar to the Original Work, but in some places virtually identical, as discussed fully below, and satisfies both the extrinsic and intrinsic tests for copyright infringement. All Defendants herein are practical partners of each other as that term is understood under California law.  All Defendants herein are jointly and severally liable for willful copyright infringement, as all have benefitted from the copying of the Original Work as described herein, and all have violated one or more of Plaintiffs' exclusive rights under Section 106 of the United States Copyright Act.

## **PARTIES**

29.   Plaintiff Key, an individual, is a resident of the State of California. Key co-wrote the Original Work with Mosely, Parsons, and Mackin.  Key is best known as the former lead singer, songwriter, and rhythm guitarist of the former band "Yellowcard."  Key is a co-owner of the registered copyright in the Original Work.  He became the lead singer of "Yellowcard" in 2000.  Key is currently the owner/operator of Lone Tree Recordings, a recording studio in Franklin, Tennessee.  He is currently touring and writing music as a solo acoustic artist.

30.   Plaintiff Mosely, an individual, is a resident of the State of Florida. Mosely joined "Yellowcard" in 2002 and is the former bassist of the band. Mosely co-wrote the Original Work with Key, Parsons, and Mackin.  Mosely is a co-owner of the registered copyright in the Original Work.  Mosely is currently a triple major in music at Jacksonville University obtaining degrees in Music Business, Commercial Music, and Music Composition.

31.   Plaintiff Parsons, an individual, is a resident of the State of California.  Parsons co-wrote the Original Work with Key, Mosely, and Mackin. Parsons is best known for being the former drummer of the former band "Yellowcard."  Parsons is a co-owner of the registered copyright in the Original Work.  He joined "Yellowcard" in 1997.

32.   Plaintiff Sean Mackin, an individual, is a resident of the State of Washington.  Mackin is best known as the violinist and backup vocalist for the former band "Yellowcard."   Mackin co-wrote the Original Work with Key, Moseley, and Parsons.  Mackin is a co-owner of the registered copyright in the Original Work.  He joined "Yellowcard" in 1997.

33.   Defendant Juice WRLD, an individual, is a resident of California. Juice WRLD is a recording artist and a co-writer of the Infringing Work. Juice WRLD is also the performer of the Infringing Sound Recording.

34.     Defendant Taz Taylor, an individual, upon information and belief, was a resident of the State of Florida and now is a resident of the State of California.  Defendant Taz Taylor is a credited writer of the Infringing Work "Lucid Dreams."  Upon information and belief, Taz Taylor resides in the Internet Money mansion in Los Angeles, California and is thus, a resident of the State of California. Upon information and belief, Defendant Taz Taylor is a founder and owner of Defendant Taylor Beats.

35.     Defendant Nick Mira, an individual, upon information and belief, was a resident of the State of Virginia and now is a resident of the State of California. Upon information and belief, Nick Mira resides at the Internet Money mansion with Taz Taylor in Los Angeles, California. Nick Mira is a co-writer and the producer of the Infringing Work and Infringing Sound Recording. Upon information and belief, Defendant Nick Mira is a founder and owner of Defendant Nick Mira Publishing.

36.     Defendant BMG, a Delaware limited liability company, is registered to do business in California and has an office located at 6100 Wilshire Boulevard, Suite #1600, Los Angeles, California 90048.  BMG is administered by BMG Chrysalis and is a publisher of the Infringing Work.  BMG has exploited the Infringing Work and collects royalties for the Infringing Work.

37.     Defendant Taylor Beats is a Florida limited liability company organized and existing under the laws of Florida. Defendant Taylor Beats has a principal place of business at 10438 Dodd Road, Jacksonville, Florida 32218. Defendant Taylor Beats is a publisher for Taz Taylor and upon and information belief, collects the publishing share for Taz Taylor on the Infringing Work. Defendant Taylor Beats is administered by Kobalt.  Defendant Taylor Beats has exploited the Infringing Work and collects royalties for the Infringing Work as discussed herein.  Defendant Taylor Beats is reported as inactive with the State

of Florida since September 28, 2018.

38.     Defendant Artist 101 is a publisher of Artist Publishing Group, which is the publishing division of Artist Partner Group.  Artist Partner Group is a Delaware corporation existing and organized under the laws of Delaware with a principal place of business at 816 N. Fairfax Avenue, 2nd Floor, Los Angeles, California 90046.  Defendant Artist 101 is a publisher for Taz Taylor and upon information and belief, collects the publishing share for Taz Taylor on the Infringing Work. Artist 101 is administered by Kobalt.  Artist 101 is a publisher of the Infringing Work.  Artist 101 has exploited the Infringing Work and collects royalties for the Infringing Work as discussed herein.

39.     Defendant Nick Mira Publishing is administered by Songs of Universal.  Defendant Nick Mira Publishing is a publisher and collects Defendant Nick Mira's publishing share of the Infringing Work.  Defendant Nick Mira Publishing has exploited the Infringing Work and collects royalties for the Infringing Work as discussed herein.

40.     Defendant Electric Feel is administered by Songs of Universal. Defendant Electric Feel is a publisher and collects Defendant Nick Mira's publishing share of the Infringing Work.  Defendant Electric Feel has exploited the Infringing Work and collects royalties for the Infringing Work as discussed herein.

41.     Defendant Kobalt is a Delaware corporation organized and existing under the laws of Delaware with its principal place of business at 220 West 42nd Street, 11th Floor, New York, New York 10036. Kobalt also has an office located at 8201 Beverly Blvd, 4th Floor, Suite 400, West Hollywood, California 90048. Upon information and belief, Kobalt is the publishing administrator for Defendant Artist 101 and Defendant Taylor Beats on the Infringing Work "Lucid Dreams."  Upon information and belief, Defendant Artist 101 and Defendant

Taylor Beats are publishers for Taz Taylor. Kobalt has exploited the Infringing Work and collects royalties for the Infringing Work as discussed herein.

42.     Defendant Songs of Universal is a California corporation organized and existing under the laws of California with its principal place of business at 2100 Colorado Avenue, Santa Monica, California 90404. Upon information and belief, Songs of Universal is the publishing administrator for Defendant Electric Feel's and Defendant Nick Mira Publishing's interest in the Infringing Work. Defendant Electric Feel and Defendant Nick Mira Publishing are publishers for Nick Mira. Universal has exploited the Infringing Work and collects royalties for the Infringing Work as discussed herein.

43.     Defendant Grade A Productions is an Illinois limited liability company organized and existing under the laws of Illinois. Defendant Grade A Productions has a principal place of business at THE IM GRP-40 Wall St. 28th Floor, New York, New York 10005.  Defendant Grade A Productions is the record label of the Infringing Work and Infringing Sound Recording "Lucid Dreams." Defendant Grade A Productions has exploited the Infringing Work and Infringing Sound Recording and collects royalties for the Infringing Work and Infringing Sound Recording as discussed herein.   Defendant Grade A Productions can be served through its agent Brandon G. Dickinson at 4041 South Calumet #2 Chicago, Illinois 60653.

44.     Defendant Interscope is a record label owned by Universal Music Group through its Interscope Geffen A&M imprint. Interscope is a California general partnership. Interscope's principal place of business is located at 2200 Colorado Avenue, Santa Monica, California 90404.  Upon information and belief, Interscope is the distributor for Grade A Productions's interest in the Infringing Work and Infringing Sound Recording.  Interscope has exploited the Infringing Work and Infringing Sound Recording and collects royalties for the

Infringing Work and Infringing Sound Recording as discussed herein.

## STATEMENT OF FACTS

### I.   Background of the Writers of "Holly Wood Died"

45.   Prior to becoming a member of "Yellowcard," Key contributed and provided backup vocals for the band's first album.  In 2000, Key returned to "Yellowcard" as the band's lead singer.  He later became a rhythm guitarist for the band as well.  Key has also worked with or been featured in songs by Taboo of the band the "Black Eyed Peas," "Silverstein," "Linkin Park," "U2," and "New Found Glory."  Key is a co-author of "Holly Wood Died."

46.   Mosely joined "Yellowcard" as a bassist in 2002.  Mosely took a crucial role in writing and recording "Yellowcard's" debut album, *Ocean Avenue*.  Mosely is a co-author of "Holly Wood Died," which is featured on "Yellowcard's" album, *Lights and Sounds*.  *Lights and Sounds* peaked at number five on the U.S. Billboard 200.

47.   Parsons is a founding member of the band "Yellowcard."  Parsons is a co-author of the Original Work.  Parsons played drums for Adam Lambert.  He was also involved in forming the rap-rock group, "LMPD," and the band, "This Legend."  Parsons is a drummer for the band "New Year's Day."

48.   Mackin is an original member of the former band "Yellowcard" and was involved with the band as a violinist and backup vocalist.  Mackin is a co-author of "Holly Wood Died."  While a member of "Yellowcard," the band toured with "Linkin Park" and "Blue October."

49.   "Yellowcard" has had multiple hit singles, including "Way Away," "Ocean Avenue," "Only One," "Lights and Sounds," "For You, and Your Denial," and "Holly Wood Died."

50.   "Yellowcard" has released albums that have peaked on charts in the United States, including *Lights and Sounds*, which peaked at number 5, *Southern*

*Air*, which peaked at number 10, *Paper Walls*, which peaked at number 13, and *When You're Through Thinking, Say Yes*, which peaked at number 19.

51.     "Yellowcard" has national and international exposure with its music offered through digital providers such as Spotify, Apple Music, YouTube, and Amazon.

52.     To date, the Original Work has generated over 1,879,000 streams on Spotify and over 46,000 views on YouTube.  *Lights and Sounds*, the album containing the Original Work, was certified "gold" on March 15, 2006.

53.     The Original Work is original, and Defendants copied, as discussed below, original elements from it.

## II.     **Background and Success of the Infringing Work and Infringing Sound Recording**

54.     Defendants are the performers, writers, producers, publishers, and administrators of the Infringing Work and Infringing Sound Recording.

55.     Defendant Juice WRLD is an emo-leaning Chicago rapper whose performing name Juice WRLD was inspired by the 1992 2Pac film Juice. Defendant Juice WRLD began to develop himself as an artist in his freshman year of high school, but really started to pop up on the nationwide hip-hop radar with the creation of the Infringing Work.

56.     In early 2017, Defendant Nick Mira and Defendant Juice WRLD became acquainted through a mutual connection, Sidepce.

57.     In an interview explaining how his company Internet Money helped launch Juice WRLD's career, Defendant Taz Taylor stated that Juice WRLD was supposed to be one of the first artists he signed with Internet Money.  In the October 5, 2018 interview, Defendant Taz Taylor explained that he never really had a relationship with Defendant Juice WRLD but that Defendant Nick Mira has been developing Defendant Juice WRLD for almost two years.

58.    The Infringing Work was created by the Defendant writers based upon the copying of two songs:  Sting's "Shape of my Heart," and the Original Work.   While Defendants licensed Sting's work, they decided to willfully infringe the Original Work.

59.    On June 15, 2017, Defendant Juice WRLD released the Infringing Work on SoundCloud.

60.    On May 4, 2018, Defendant Grade A Productions and Defendant Interscope officially released the Infringing Sound Recording and the Infringing Work.

61.    The Infringing Work and Infringing Sound Recording peaked at No. 2 on U.S. Billboard Hot 100.   The song was on the chart for 46 weeks.   The Infringing Work and Infringing Sound Recording peaked at No. 1 on Billboard Hot R&B/Hip-Hop Songs.   The song was on the chart for 34 weeks.   The Infringing Work and Infringing Sound Recording peaked at No. 1 on Billboard Rhythmic Songs.  The song was on the chart for 28 weeks.

62.    When the Infringing Work/Infringing Sound Recording rose to No. 9 on U.S. Billboard Hot 100 on June 12, 2018, the song became Defendant Juice WRLD's first top 10 song.

63.    As of October 21, 2019, the music video for "Lucid Dreams" has attracted more than 381,307,000 views on YouTube.  As of October 21, 2019, "Lucid Dreams" has over 939,955,000 streams on Spotify.

64.    On May 24, 2019, "Lucid Dreams" was certified 5x Multi-Platinum by RIAA for selling over 5,000,000 copies.

65.    Juice WRLD performed "Lucid Dreams" live on *Jimmy Kimmel Live!* on August 7, 2018 in Los Angeles, California.  Juice WRLD performed "Lucid Dreams" live during the 2018 MTV Video Music Awards on August 20, 2018 in New York, New York.

66.     Juice WRLD performed "Lucid Dreams" on April 13, 2019 at the Coachella Festival in Indio, California.

67.     Upon information and belief, Defendant Juice WRLD performed "Lucid Dreams" on tour, which consisted of concerts in Belgium, Finland, Hungary, Sweden, Ireland, the Netherlands, Germany, the United Kingdom, Canada, Australia, and the United States, including in New Jersey, Washington, Wisconsin, New York, Illinois, North Dakota, Colorado, California, Florida, Georgia, Massachusetts, Michigan, Texas, and Tennessee.

68.     Juice WRLD recently performed on September 28, 2019 at RingCentral Coliseum in Oakland, California and on September 29, 2019 at The Grounds at Oakland Coliseum in Oakland, California.  Juice WRLD is currently scheduled to perform on November 9, 2019 at Dodger Stadium in Los Angeles, California.

**III.   Access**

69.     As set forth above, the Original Work was a huge success.  Thus, Plaintiffs and the Original Work were well-known to Defendants.

70.     Upon the release of "Lucid Dreams," members of "Yellowcard" immediately recognized the copying of the Original Work, "Holly Wood Died."

71.     Defendant Juice WRLD is admittedly familiar with and has studied the genre of music of "Holly Wood Died" and "Yellowcard," and specifically has admitted on multiple occasions of studying this genre of music at the precise time that the Original Work was a hit.

72.     Specifically, in a published interview, Defendant Juice WRLD stated that he had a crush on a girl in fifth grade who was "really Emo."  At the time, the girl mentioned that she really enjoyed Emo pop rock, which is the precise genre of "Yellowcard's" music.  Defendant Juice WRLD stated that he went home and listened to that music.  He stated that he listened to and educated

himself in Emo pop rock music so that he would have something to talk to her about.  He stated that he ended up liking it and has studied it from that point forward as discussed more fully below.

73.     Upon information and belief, based upon his current age, these initial events would have occurred in approximately 2006.   Thus, upon information and belief, at the time Defendant Juice WRLD began studying the Emo genre of music, "Holly Wood Died" would have been recently released.

74.     Defendant Juice WRLD has also admitted his familiarity and appreciation for the work of the band "Fall Out Boy" in an interview.  He stated that one of the hits from the 2005 "Fall Out Boy" album *From Under the Cork Tree* hit really hard to him and that the rest of the album had the same kind of vibe to it.

75.     "Fall Out Boy's" music falls within the same genre of music as "Yellowcard's" music.

76.     "Fall Out Boy's" album *From Under the Cork Tree* was released in May 2005.  "Holly Wood Died" was released in January 2006.  Thus, at the time "Holly Wood Died" was released, Defendant Juice WRLD was familiar with and studying that same genre of music.

77.     Moreover, and not coincidentally, "Fall Out Boy's" album *From Under the Cork Tree* and "Yellowcard's" album *Lights and Sounds* have the same producer, Neal Avron.  Since it is very common for a fan of works produced for an artist by a specific producer to listen to other works by that same producer, it is likely that Defendant Juice WRLD's appreciation for the album *From Under the Cork Tree* led to exposure to "Yellowcard's" album *Lights and Sounds* and the Original Work "Holly Wood Died."

78.     In addition, in a separate interview, Defendant Juice WRLD discussed influences on him.  In that interview, he discussed rap music embracing

other genres and stated that he has a big rock background.  He specifically stated that his background includes the subcategories of rock music, alternative and post hardcore.  He mentioned the following groups, "Black Sabbath," "Foo Fighters," "Fall Out Boy," and "The Devil Wears Prada."   These groups were peers of "Yellowcard," and "Yellowcard's" music is rooted in the same genre of music as these groups.

79.    Defendant Juice WRLD even collaborated on the song "Roses" with the rock band "Panic! at the Disco."

80.    Indeed, in a recent article discussing the dominant form of rock music, "Emo pop" and post hardcore, "Yellowcard" and the aforementioned "Fall Out Boy," were specifically mentioned as representing this genre.

81.    The same article discusses the rise of the hip-hop subgenre "Emo rap" and specifically listed the Infringing Work as representing this subgenre.  Another article describes Defendant Juice WRLD as an Emo rap ambassador.

82.    A separate article discusses hip-hop artists that take a more pop-punk influenced approach.  One of the artists listed that falls into this category is Defendant Juice WRLD.

83.    There is a clear record of Defendant Juice WRLD's exposure to the type of music "Yellowcard" produced.  There is evidence that he studied and listened to "Yellowcard's" peers at the same exact time that the Original Work was released, and, therefore, certainly "Yellowcard" itself.  This exposure would have most certainly led Defendant Juice WRLD directly to the Infringing Work "Holly Wood Died." Given all of the foregoing, it is virtually impossible that it did not.

84.    Not only did Defendants therefore have undeniable access to the Infringing Work, Defendants have admittedly sampled Sting's "Shape of My Heart" in "Lucid Dreams."  Specifically, Nick Mira admitted during an interview

that after he watched the movie *Leon The Professional*, and heard Sting's "Shape of My Heart," he immediately looked it up and listened to it.  Not only did Nick Mira listen to Sting's "Shape of My Heart," he "tweaked the notes" and "added drums" and used the sample in "Lucid Dreams." Like Sting's "Shape of My Heart," Plaintiff's Original Work, "Holly Wood Died," was a big hit (the album was certified Gold), and publicly available to Defendants. Unlike Sting's "Shape of My Heart," however, Defendants decided to simply willfully infringe Plaintiffs' Original Work.

## IV.   Substantial Similarity

85.   In addition to being apparent to the ordinary listener, melodic elements of the works are not only substantially similar, but actually go beyond striking similarity in places, and are virtually identical. Indeed, as shown below, a direct comparison of the musical works transcribed in the same key of A Minor and at the same octave, of both "Holly Wood Died" and the Infringing Work and Infringing Sound Recording, reveals that these works are not only substantially similar, but, as noted, in places are virtually identical.   These substantial similarities include, but are not limited to, the following:

86.   The vocal melody found in the first verse of "Holly Wood Died" and the vocal melody found in the first chorus of "Lucid Dreams" go beyond substantial similarity.

87.   The vocal melodies in question constitute essential identifying features of "Holly Wood Died" in both qualitative and quantitative ways. This is especially important qualitatively as the melody shared between the two works constitutes each song's distinctive recognizable "hook."

88.   In both songs, the vocal melodies consist of a pair of phrases constituting a passage.  This passage recurs three times in the Infringing Work and Infringing Sound Recording.  Additionally, this passage appears once in each

song superimposed with either the additional verse or the chorus material. These similarities surpass the likelihood of coincidence to the extent that they could only reasonably be the result of an act of copying.

89. The following musical transcriptions demonstrate the strong similarities of the vocal melodies. A solid vertical line indicates a note that is the same in terms of both pitch and synchronicity (timing position). A dotted vertical line indicates a note that is the same in terms of pitch and almost the same in terms of synchronicity.



90.     Of the above transcribed eight-bar section, there are 26 vertical lines shown, 18 of which are solid and 8 of which are dotted.  There are correlating notes in every single bar of the 8-bar sections in each of the two works.

91.     Of the 38 notes that comprise the vocal melody found in the verse of "Holly Wood Died," 26 have correlating notes in the 41-note vocal melody found in the first chorus of "Lucid Dreams."

92.     Discounting the repeated articulation of the pitch of D in bar 2 of "Lucid Dreams," the longest span of similar continuous pitches is eight in bars one to two:    **Holly Wood Died:**         **C-C-G-F-E-C-D-C**

  **Lucid Dreams:**         **C-C-G-F-E-C-D-(D)-C**

93.     In bar two, above, all six notes that comprise the melodic phrase in "Holly Wood Died" have correlating notes in the 7-note melodic phrase found in "Lucid Dreams," with five of those six notes being identical in terms of pitch and synchronicity, and just one note being identical in terms of pitch but not precisely the same in terms of synchronicity.

94.     The preponderance of similar notes in every single bar with one bar in particular (bar two, above) containing notes that are beyond substantially similar, demonstrates that the similarities are the result of copying rather than of coincidence. Indeed, given the access discussion discussed above, and these similarities, any claim of independent creation is dead on arrival.  But there is even more.

95.      The vocal melody found in the second verse of "Holly Wood Died" features a melodic idiosyncrasy that also appears in the chorus of "Lucid Dreams" in a parallel position. This idiosyncrasy is in the form of a "melisma," which refers to the singing of a single syllable of text while moving between two or more notes in succession.  The following musical transcription demonstrates this

similarity, with lines to indicate coincidences of pitch.  The last two notes within the excerpts of each song below, occurring in bar 4, demonstrate this occurrence of a melisma in each work.



96.     Qualitatively, as seen in the above transcription, of the 21 notes that comprise the vocal melody in the four-bar section of the first chorus of "Lucid Dreams," 16 have correlating notes in the vocal melody found in bars five to eight of the second verse of "Holly Wood Died."  This totals an approximate 76.2% similarity of the two 4-bar sections.

97.     In "Holly Wood Died," the melisma is found in the setting of the last word ("heart") of the phrase "like razors they cut through the heart." The last single-syllable word "heart" is sung to the two pitches C-A with the pitch C falling on the strongly accented downbeat (the first beat) of the bar and the pitch A falling on the second semi-quaver or sixteenth note beat of the bar.

98.     In "Lucid Dreams," the melisma is found on the last word ("dead") of the phrase "I know that you want me dead."  Just as with "Holly Wood Died," the last single-syllable word "dead" is also sung to the same two pitches C-A,

with the same rhythms and with the same synchronicity (timing position), with the pitch C falling on the strongly accented downbeat of the bar and the pitch A falling on the second semi-quaver or sixteenth note beat of the bar.

99.    The melisma represents a shared creative choice which, when combined with the other similarities identified, is even further evidence that the Infringing Work was not independently created.

100.    The high degree of objective similarity between the Original Work and the Infringing Work extends well beyond the possibility of coincidence and could only reasonably be the result of an act of copying.

101.    The Infringing Work is therefore not wholly an original work, but relies in crucial parts on "Holly Wood Died" for its musical identity. The copying of the Infringing Work was willful.

**V.    Continued Exploitation**

102.    Juice WRLD, Nick Mira, and Taz Taylor are the authors of the Infringing Work. Upon information and belief, Juice WRLD, Nick Mira, and Taz Taylor were responsible for and/or benefitted from the creation, reproduction, manufacture, distribution, or sale of "Lucid Dreams" which features the Original Work "Holly Wood Died."

103.    All of the Defendants were responsible for and benefitted from the creation, reproduction, manufacture, distribution, or sale of "Lucid Dreams" which features the Original Work "Holly Wood Died."

104.    Interscope and Grade A Productions are the record labels of the Infringing Work and Infringing Sound Recording. Upon information and belief, Interscope and Grade A Productions were responsible for and/or benefitted from the creation, reproduction, manufacture, distribution, or sale of "Lucid Dreams" which features the Original Work "Holly Wood Died."

105.   Each of the Defendants contributed to or exploited or continues to exploit the Infringing Work and Infringing Sound Recording.  The conduct in the creation and exploitation of the Infringing Work and Infringing Sound Recording constitutes willful copyright infringement.  Defendants were put on notice of their infringing conduct, but continued to infringe nonetheless.

106.   The overwhelming success of the Infringing Work and Infringing Sound Recording as set forth above has provided Defendants substantial opportunities to tour and perform around the world. The revenue and profits derived from these performances and appearances, among all other revenue and profits, are directly attributable to the success of the Infringing Work and Infringing Sound Recording. Thus, the touring and concert revenue generated for Defendants is causally connected to the Infringing Work and Infringing Sound Recording, such that the touring revenue, concert revenue, and related public performance revenue should be disgorged by Plaintiffs.

107.   Not only has the Infringing Work and Infringing Sound Recording been a huge musical success for the Defendants, but it has resulted in touring revenue, artist royalties, licensing revenue, producer royalties, and songwriting and publishing revenue directly attributable to the success of the Infringing Work and Infringing Sound Recording. These opportunities would not have been available to Defendants if they had not infringed Plaintiffs' Original Work.

108.   The Infringing Work and Infringing Sound Recording continue to be reproduced, sold, distributed, publicly performed, licensed, and otherwise exploited on compact discs and albums by Defendants, and as digital downloads, ringtones, and mastertones, and in music videos, all without payment to Plaintiffs.

109.   As discussed above, all Defendants are responsible in some manner for the events described herein and are liable to Plaintiffs for damages available under the Copyright Act. Defendants are involved with the creation, release,

reproduction, distribution, exploitation, licensing, receipt of revenue, and public performance of the Infringing Work and Infringing Sound Recording, which constitutes, among other things, the improper preparation of a derivative work and direct, vicarious, and contributory infringement. As co-infringers and practical partners, Defendants are jointly and severally liable for all amounts owed, and for the profits enjoyed by the others. Upon information and belief, Defendants have received, or are owed in pipeline money, in total, more than $15 million in profits related to the Infringing Work and Infringing Sound Recording. This revenue and profit received by Defendants include, but is not limited to, artist royalties, producer royalties, revenue from sales and/or licensing of the Infringing Work and Infringing Sound Recording, writer and publisher royalties, licensing royalties, synchronization royalties, public performance royalties, touring revenue, and other revenue, among other things, all of which are directly attributable to the Original Work and should be disgorged to Plaintiffs.

110.   These acts by Defendants are willful, knowing, and malicious, and perpetrated without regard to Plaintiffs' rights.

111.   Plaintiffs have never received proper credits for Defendants' use of the Original Work "Holly Wood Died" in the Infringing Work and Infringing Sound Recording.

112.   Plaintiffs have never received any royalties or payment of any kind for Defendants' use of the Original Work "Holly Wood Died" in the Infringing Work and Infringing Sound Recording.

## FIRST CAUSE OF ACTION

### (Copyright Infringement – 17 U.S.C. § 501)

### (Against All Defendants)

113.   Plaintiffs respectfully repeat and incorporate by reference the allegations contained in Paragraphs 1 through 112, as though fully set forth herein.

114.   Plaintiffs are the legal and beneficial owners of the United States copyright in the work "Holly Wood Died," Registration Number PA0001163895, as discussed above.

115.   Defendants have directly, vicariously, and/or contributorily infringed and/or induced infringement of Plaintiffs' copyright in violation of 17 U.S.C. § 501.

116.   Defendants had access to "Holly Wood Died" as discussed above.

117.   Defendants' acts were performed without Plaintiffs' permission, license, or consent.  Defendants' unauthorized reproduction, distribution, public performance, display, and creation of a derivative work, "Lucid Dreams," in the Infringing Work and Infringing Sound Recording, infringe Plaintiffs' exclusive rights in violation of the Copyright Act, 17 U.S.C. § 101 *et. seq.*

118.   Defendants' infringement has been and continues to be, willful, intentional, purposeful, and with complete disregard to Plaintiffs' rights.

119.   As a direct and proximate result of Defendants' infringement, Plaintiffs have been irreparably harmed.

120.   "Lucid Dreams" copies prominent original parts of "Holly Wood Died."  This copying satisfies both the intrinsic and extrinsic tests to establish copyright infringement. The portions copied are both qualitatively and quantitatively important to both the Original Work "Holly Wood Died," and the Infringing Work and Sound Recording "Lucid Dreams." The Infringing Work embodies the prominent original parts of "Holly Wood Died" copied by "Lucid Dreams."

121.   From the date of creation of "Lucid Dreams," all Defendants have infringed Plaintiffs' copyright interest in "Holly Wood Died" including:

a.   by substantially copying and publicly performing, or authorizing the copying and public performance, including publicly

performing "Lucid Dreams" at radio, live concerts, personal appearances, and on video, television, and otherwise;

      b.    by substantially copying the related marketing and promotion of the sale of the videos, tickets to concerts and other performances, and other merchandise; and

      c.    by participating in and furthering the aforementioned infringing acts, and/or sharing in the proceeds therefrom, all through substantial use of "Holly Wood Died" in and as part of "Lucid Dreams," and the Infringing Work, packaged in a variety of configurations and digital downloads, mixes, and versions, and performed in a variety of ways including radio, concerts, personal appearances, video, television, and/or otherwise.

122.   Plaintiffs have received no copyright ownership interests in, and for any of the exploitations of, "Lucid Dreams" or any of the works associated with "Lucid Dreams."

123.  Defendants have and continue to reproduce, distribute, and manufacture large numbers of the Infringing Work and Infringing Sound Recording, which violates Plaintiffs' copyrights and are at issue in this lawsuit. Defendants have not only marketed and exploited the works that are at issue but have granted or caused to be granted to various parties, licenses to produce, sample, and/or distribute the work that is in violation of Plaintiffs' copyright.

124.  Defendants had the right and ability to control other infringers and have derived a direct financial benefit from that infringement such that Defendants should be found to be vicariously liable.

125.  Defendants, with knowledge of the infringement, materially contributed to the direct infringement alleged herein such that they may be found contributorily liable.

126. The infringement is continuing as "Lucid Dreams," and the Infringing Work and Infringing Sound Recording, continue to be licensed for sale, downloads, ringtones, mastertones, and other exploitations by Defendants, and/or their agents.

127. As a direct and proximate result of Defendants' infringement, pursuant to 17 U.S.C. § 504 (a)(1) and (b), Plaintiffs are entitled to actual damages in addition to Defendants' profits both domestically and relating to foreign sales of other exploitation of the Infringing Work and Infringing Sound Recording, which were manufactured, distributed, or otherwise infringed domestically. On information and belief, that amount exceeds $15 million. Further, Plaintiffs are entitled to a running royalty on all future exploitations of the Infringing Work and Infringing Sound Recording following judgment in an amount to be determined.

128. In the alternative to profits and actual damages, pursuant to 17 U.S.C. § 504(c), Plaintiffs are entitled to the maximum amount of statutory damages for each act of copyright infringement.

129. As a direct and proximate result of Defendants' infringement, Plaintiffs have incurred attorneys' fees and costs which are recoverable pursuant to 17 U.S.C. § 505.

130. Defendants' conduct has caused, is continuing to cause, and will further cause great damage to Plaintiffs, which damages cannot be accurately measured in monetary terms, and therefore, unless enjoined by the Court, Plaintiffs will suffer irreparable injury, for which Plaintiffs are without adequate remedy at law. Accordingly, Plaintiffs are entitled to a permanent injunction pursuant to 17 U.S.C. § 502 following judgment, prohibiting further infringement, reproduction, distribution, sale, public performance, other use, or exploitation of Plaintiffs' copyright.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief, as follows:

1.      For judgment in favor of Plaintiffs and against Defendants;

2.      For a declaration and finding that Defendants have willfully infringed Plaintiffs' copyrighted work in violation of the Copyright Act;

3.      For a declaration and finding that Defendants are directly, vicariously, and/or contributorily liable for copyright infringement, as applicable;

4.      For actual damages and profits for copyright infringement pursuant to 17 U.S.C. § 504(a)(1) and (b), including a finding that Defendants are jointly and severally liable for actual damages, as well as for each other's profits as practical partners;

5.      For an accounting of all profits, income, receipts, or other benefits derived by Defendants from the reproduction, copying, display, promotion, distribution, or sale of products and services or other media, either now known or hereafter devised, that improperly or unlawfully infringe Plaintiffs' copyright pursuant to 17 U.S.C. § 504(a)(1) and (b);

6.      For statutory damages, upon election prior to final judgment in the alternative to actual damages and profits, for willful copyright infringement pursuant to 17 U.S.C. § 504(c);

7.      For cost of suit herein, including an award of attorneys' fees pursuant to 17 U.S.C. § 505;

8.      For pre-judgment and post-judgment interest;

9.      For a running royalty and/or ownership share in the Infringing Work and Infringing Sound Recording following judgment in an amount to be proven at trial, or in the alternative, for the entry of an injunction requiring Defendants, their officers, agents, servants, employees, representatives, successors, licensees, partners, attorneys, and assigns, and all persons acting in concert or participation

with each or any one of them to be permanently enjoined from directly or indirectly infringing, reproducing, displaying, promoting, advertising, distributing, or selling any work that infringes, contributorily infringes, or vicariously infringes Plaintiffs' rights in the work protected by the Copyright Act;

10.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), and otherwise, Plaintiffs respectfully demand a jury trial on all issues raised in this complaint.


Dated: October 21, 2019                    Respectfully submitted,



By:  /s/ Richard S. Busch
Richard S. Busch (SBN 319881)
*E-Mail: rbusch@kingballow.com*
KING & BALLOW
1999 Avenue of the Stars, Suite 1100
Century City, CA 90067
Telephone: (424) 253-1255
Facsimile: (888) 688-0482

*Attorney for Plaintiffs*